*681 Reversed and remanded by published opinion. Judge KING wrote the opinion, in which Judge SHEDD joined. Judge DAVIS wrote a separate opinion dissenting in part and concurring in the judgment in part.
OPINION
KING, Circuit Judge:
The Government pursues this interlocutory appeal from the district court’s decision of December 1, 2008, suppressing evidence obtained from defendant Mario Day by private security guards. See United States v. Day, 590 F.Supp.2d 796 (E.D.Va.2008). The court’s decision was premised on its determination that the security guards acted as Government agents and contravened Day’s constitutional rights. More specifically, the court concluded that the security guards violated Day’s Fourth Amendment rights, by conducting a search and seizure beyond the scope authorized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and his Fifth Amendment rights, by conducting a custodial interrogation without first giving Day the warnings required under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because we conclude that the security guards were not acting as Government agents, we reverse and remand.
I.
The relevant facts, as outlined by the district court, are as follows:
On July 5, 2008, Officers Costa and Slader of the American Security Group were on duty at the Regency Lake apartment complex [in Chesterfield County, Virginia]. They are both “armed security officers” with the power to arrest pursuant to Virginia Code Section 9.1-138 et seq. While patrolling, the officers noticed a gathering at 6464 Planet Road. Shortly after midnight, they observed individuals later identified as Evan Moore and Mario Day, the defendant, in the middle of the road arguing with unseen individuals inside the apartment. The officers observed Day retrieve a gun from a nearby Caprice. Holding the gun at the “low and ready,” Day began advancing on the apartment while continuing to shout at the individuals inside. Exiting their patrol car, the officers drew their weapons and yelled at Day to freeze as they ran towards him. Day immediately placed the gun on the floorboard of the Caprice and raised his hands. The officers placed Day in restraints and conducted a Terry search, wherein they found no suspicious bulges or hard objects. Nevertheless, and without giving any Miranda warnings, Officer Costa asked Day if he had “anything illegal” on him. Day admitted he ha[d] a little marijuana; Officer Cos-ta reached into Day’s pants pocket and retrieved the marijuana. The officers also questioned Day about the firearm, which he said he was carrying for his safety.
The officers contacted their superior, Lieutenant Pentato, and the Chesterfield police department. Chesterfield Police Officer Neville arrived and took over custody of Day and Moore.
Day, 590 F.Supp.2d at 799.
On September 3, 2008, a grand jury in the Eastern District of Virginia indicted Day on a single count of being a drug user in possession of a firearm, in contravention of 18 U.S.C. § 922(g)(3), and on an additional count of possession of marijuana, in violation of 21 U.S.C. § 844(a). On October 17, 2008, Day filed a motion to suppress “the firearm, marijuana and all statements made by [him] on the day of *682 his arrest.” J.A. 75.[1] Thereafter, on November 12, 2008, the district court conducted a hearing on the suppression motion.
By its decision of December 1, 2008, the district court granted Day’s suppression motion in part and denied it in part. More specifically, the court granted the suppression motion “as to the marijuana and to all statements about the firearm or marijuana,” and denied the motion “as to the firearm” itself. Day, 590 F.Supp.2d at 804.[2] In so ruling, the court first determined that Officers Costa and Slader, though private security guards, “were acting as governmental agents in their interactions with Day.” Id. at 802. Accordingly, the court proceeded to consider whether Costa and Slader had contravened Day’s constitutional rights. The court concluded that, “[t]o ensure their safety and that of bystanders, the officers were justified in conducting the pat-down of Day’s clothing” and in “seizing] ... the plainly visible gun.” Id. at 803. The court further concluded, however, that once the pat-down revealed “nothing indicative of either a weapon or contraband,” the search was “no longer valid under Terry” — thus requiring suppression of the marijuana. Id. (internal quotation marks omitted). Finally, the court concluded that Day was in custody when he was questioned by Costa and Slader, and that, having already “secured the firearm and conducted a fruitless Terry search,” “the officers could not get a second bite at the apple by engaging in custodial interrogation without issuing a Miranda warning.” Id. at 804. The court therefore suppressed Day’s statements to Costa and Slader about the marijuana and the firearm. See id.
On December 10, 2008, the day before Day’s trial had been scheduled to begin, the Government timely noted this appeal. In accordance with the jurisdictional predicate of 18 U.S.C. § 3731, the United States Attorney has certified that the appeal “is not taken for the purpose of delay” and that the excluded evidence constitutes “a substantial proof of a fact material in the proceeding.” J.A. 95. We thus possess jurisdiction pursuant to the provisions of § 3731.
II.
In assessing a trial court’s decision on a motion to suppress, we review the court’s factual findings for clear error and its legal determinations de novo. See United States v. Kellam, 568 F.3d 125, 132 (4th Cir.2009). The Government’s primary contention in this appeal is that the district court erred in concluding that Officers Costa and Slader were acting as Government agents at the time of their encounter with Day. As such, the Government asserts that the court erroneously suppressed the marijuana, as well as the marijuana- and firearm-related statements. As explained *683 below, we agree with the Government and thus reverse and remand.[3]
A.
It is axiomatic that “[t]he Fourth Amendment protects against unreasonable searches and seizures by Government officials and those private individuals acting as instruments or agents of the Government.” United States v. Jarrett, 338 F.3d 339, 344 (4th Cir.2003) (citing Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)) (internal quotation marks and alterations omitted). The Fourth Amendment, however, “does not provide protection against searches by private individuals acting in a private capacity.” Id. (citing United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). Similarly, “[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion.” Colorado v. Connelly, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Thus, regardless of whether the Fourth or Fifth Amendment is at issue, we apply the same test to determine whether a private individual acted as a Government agent. Cf. United States v. Alexander, 447 F.3d 1290, 1294-95 (10th Cir.2006).
First of all, under the applicable test, “[t]he defendant bears the burden of proving that an agency relationship exists” between the Government and the private individual. Jarrett, 338 F.3d at 344 (citing United States v. Ellyson, 326 F.3d 522, 527 (4th Cir.2003)).[4] As we have observed, “whether the requisite agency relationship exists ‘necessarily turns on the degree of the Government’s participation in the private party’s activities, ... a question that can only be resolved in light of all the circumstances.’ ” Jarrett, 338 F.3d at 344 (quoting Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)) (alteration in original). This “is a fact-intensive inquiry that is guided by common law agency principles.” Ellyson, 326 F.3d at 527. We have recognized “two primary factors” to be considered: (1) “whether the Government knew of and acquiesced in the private” individual's challenged conduct; and (2) “whether the private individual intended to assist law enforcement or had some other independent motivation.” Jarrett, 338 F.3d at 344; see also Ellyson, 326 F.3d at 527 (compressing two factors into “[o]ne highly pertinent consideration”).
B.
Here, in concluding that the private security guards, Officers Costa and Slader, acted as Government agents during their encounter with Day, the district court focused on the Commonwealth of Virginia’s regulation of private security guards. The court noted that Costa and Slader each *684 was an “armed security officer,” as defined in the Code of Virginia. See Day, 590 F.Supp.2d at 799 (citing Va.Code. Ann. § 9.1-138). And the court observed that “[t]hese officers were vetted, trained, and continue to be subject to disciplinary action under the aegis of the state’s Criminal Justice Services Board.” Id. at 801; see also id. at 800 (discussing Va.Code Ann. § 9.1-139(C), (F) (requiring an armed security officer to obtain “a valid registration” by satisfying “compulsory minimum training standards established by the Board” and submitting to a “state and national fingerprint search”); Va.Code Ann. § 9.1-141(0(6) (empowering the Board, inter alia, to “[rjeceive complaints concerning the conduct of [an armed security officer], to conduct investigations, and to take appropriate disciplinary action if warranted”)). Furthermore, of utmost importance to the court was the fact that, “[w]ithout limitation, the Virginia Code endows armed security officers with the power to effect arrests for any offenses occurring in an on-duty officer’s presence.” Id. at 801 (citing Va.Code Ann. § 9.1-146 (authorizing an armed security officer “to effect an arrest for an offense occurring ... in his presence” “while at a location which the [private security services] business is contracted to protect”)).
Relevant to the first factor of the applicable agency test — whether the Government “knew of and acquiesced in” the challenged conduct of Officers Costa and Slader, see Jarrett, 338 F.3d at 344 — the district court determined that, in view of Virginia’s regulatory scheme for armed security officers, “the state is not a mere passive participant” in their conduct. Day, 590 F.Supp.2d at 801-02. “[R]ather,” the court explained, Virginia “affirmatively encouraged and enabled these officers to engage in the complained-of conduct, for without their state-granted authority, these officers could not have acted as de facto police. In short, the state was the genesis of their power and activities rather than a mere passive recipient of the largess of their actions.” Id. at 802.[5]
With respect to the second factor of the applicable agency test — whether Officers Costa and Slader “intended to assist law enforcement or had some other independent motivation,” see Jarrett, 338 F.3d at 344 — the district court found that “Mlearly the officers acted with the intent of deterring crime and assisting law enforcement.” Day, 590 F.Supp.2d at 802. In light of all the circumstances, the court concluded that Costa and Slader “were acting as governmental agents in their interactions with Day.” Id.
C.
Although the district court’s analysis has some appeal, we ultimately cannot agree that Day met his burden of proving an agency relationship between the Government and Officers Costa and Slader. Cf. United States v. Poe, 556 F.3d 1113, 1117 (10th Cir.2009) (ruling that private bounty hunters did not qualify as state actors); United States v. Shahid, 117 F.3d 322, 323 (7th Cir.1997) (concluding that private security officers at shopping mall were not *685 acting as agents of Government). In explaining why this is so, we address each factor of the applicable agency test in turn.
1.
As discussed above, the first factor of the applicable test concerns “whether the Government knew of and acquiesced in the private” individual’s challenged conduct. Jarrett, 338 F.3d at 344. Significantly, “[i]n seeking to give content to this factor, we have required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship.” Id. at 345 (citing Ellyson, 326 F.3d at 527-28). Thus, for example, in the case of an alleged Fourth Amendment violation, “simple acquiescence by the Government does not suffice to transform a private search into a Government search. Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional. Passive acceptance by the Government is not enough.” Id. at 345-46.
In the district court’s view, because Virginia regulates armed security officers— and particularly because it confers on such officers the power to make certain arrests — the Commonwealth “affirmatively encouraged” the challenged conduct of Officers Costa and Slader. See Day, 590 F.Supp.2d at 802. Virginia’s regulatory scheme, however, merely permitted Costa and Slader to arrest Day; it did not require or even encourage an arrest or any other complained-of action. Indeed, nothing in the regulatory scheme suggests that Costa and Slader “would expect some benefit (e.g., receiving a reward from the government) from taking the action, or expect some detriment {e.g., getting in trouble with government authorities) from not acting.” See Shahid, 117 F.3d at 327 (describing situations where Government knew of and acquiesced in private party’s conduct). For example, although armed security officers are generally subject to disciplinary action by the Commonwealth, see Va.Code Ann. § 9.1-141(C)(6), nothing in this record indicates that Virginia could have disciplined Costa and Slader for failing to act as they did toward Day.
In these circumstances, we cannot agree with the district court that Virginia’s regulatory scheme served to “affirmatively encourage” Costa and Slader’s challenged conduct. Rather, Costa and Slader were simply empowered by the Commonwealth to make an arrest. This “ ‘[m]ere governmental authorization’ ” for an arrest by Costa and Slader, “ ‘in the absence of more active participation or encouragement,’ ” is insufficient to implicate the Fourth and Fifth Amendments. See Jarrett, 338 F.3d at 345 (quoting United States v. Walther, 652 F.2d 788, 792 (9th Cir.1981)); cf. Poe, 556 F.3d at 1124 (explaining that “Oklahoma’s extensive statutory regulation of the bail bonds industry, coupled with conferring the powers of arrest,” was insufficient to establish governmental “knowledge of or acquiescence in the [bounty hunters’] challenged search” (internal quotation marks omitted)); Shahid, 117 F.3d at 327 (observing that “[t]he government cannot be said to have induced” the challenged search by mall security officers, who expected no “benefit or detriment from the government as a result of their actions”).[6]
*686 The proposition that Virginia did not participate in or encourage the challenged conduct of Officers Costa and Slader is reinforced by testimony given during the November 12, 2008 suppression hearing in the district court — testimony uncontradicted by Day and not addressed by the court. Costa testified that, as of the time of his encounter with Day on July 5, 2008, no law enforcement agency had ever given him any directives concerning his work as a private security guard at the Regency Lake apartment complex. More specifically, Costa had received no instructions from the Chesterfield police department regarding Day and expected no reward from the police department for his actions that night. Similarly, Slader testified that no state or federal law enforcement agency directed his day-to-day activities as a security guard, that he received no compensation from any state entity, and that he neither expected nor received any reward from the Chesterfield police department in connection with Day. Additionally, Officer Neville of the Chesterfield police department — who was called to the scene and assumed custody of Day only after Costa and Slader’s challenged conduct occurred — testified that he had never directed the activities of any private security guards at the Regency Lake apartment complex. According to Neville, although he had responded to a call at the apartment complex prior to July 5, 2008, he had never previously interacted with the security guards there.
In light of this undisputed evidence, there simply is no basis for concluding that the Government participated in or affirmatively encouraged Costa and Slader’s challenged conduct. Accordingly, Day cannot satisfy his burden on the first factor of the applicable agency test.
2.
The second factor of the agency test concerns “whether the private individual intended to assist law enforcement or had some other independent motivation.” Jarrett, 338 F.3d at 344. With respect to this factor, the district court found that “[c]learly the officers acted with the intent of deterring crime and assisting law enforcement.” Day, 590 F.Supp.2d at 802. Of course, the objective of “deterring crime” is entirely consistent with Officer Costa and Slader’s responsibility to protect the tenants and property of the Regency Lake apartment complex, irrespective of any simultaneous goal of assisting law enforcement. See, e.g., J.A. 15 (testimony of Costa that “we are there as a deterrent”). “In any event, even if the sole or paramount intent of the security officers had been to assist law enforcement, ... such an intent would not transform a private action into a public action” absent a sufficient showing of Government knowledge and acquiescence under the first factor of the agency test. See Shahid, 117 F.3d at 326 (internal quotation marks omitted). Having concluded that Day failed to satisfy the test’s first factor, he cannot yet establish that Costa and Slader were acting as Government agents by satisfying the see- *687 ond factor. See Jarrett, 338 F.3d at 345 (recognizing that, because Government conceded second factor of agency test, private individual’s status as Government agent turned on first factor thereof).
D.
Finally, we address a theory of agency relied on by the district court and pursued in this appeal by Day: that, under the “public function” test typically utilized for assessing a private party’s susceptibility to a civil rights suit under 42 U.S.C. § 1983, Virginia’s conferral of arrest powers on Officers Costa and Slader was enough to render them de facto police. See Day, 590 F.Supp.2d at 800-01 (“ ‘Where private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test.’ ”) (quoting Romanski v. Detroit Entm’t, L.L.C, 428 F.3d 629, 637 (6th Cir.2005)). Our Court has applied such a test, in Rodriguez v. Smithfield Packing Co., to determine whether a plant security official was a state actor for purposes of § 1983 liability. See 338 F.3d 348, 354-55 (4th Cir.2003). As we explained in Rodriguez, “[t]he Fourth Circuit has held that ‘one of the paradigmatic means by which a private party becomes subject to section 1983 is through the government’s conferral upon that party of what is, at core, sovereign power’ — a power, in other words, that is ‘traditionally the exclusive prerogative of the State.’ ” Id. at 354 (quoting Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 342 (4th Cir.2000)); see also Romanski, 428 F.3d at 636 (“Under the public function test, a private entity is said to be performing a public function if it is exercising powers traditionally reserved to the state.... ”).[7]
The Rodriguez plaintiffs brought § 1983 claims against a plant security official, Daniel Priest, for constitutional violations allegedly committed during the plaintiffs’ August 22, 1997 arrests at the plant, in Bladen County, North Carolina, by Priest and the Bladen County Sheriff’s Department. See 338 F.3d at 352. In analyzing whether Priest was a state actor subject to § 1983 liability, we deemed the following facts to be relevant to our inquiry:
Priest was an auxiliary deputy sherifff, i.e., a sworn deputy sheriff who is not on the payroll and works at the discretion of the County Sheriff,] invested with the full panoply of powers afforded to full-time deputies, including the power to arrest. The County Sheriff had given Priest primary responsibility in his role as auxiliary deputy sheriff for a broad range of law enforcement work at the plant, from conducting criminal investigations and making arrests to serving civil and criminal papers. On August 22, Priest was working in concert with the Sheriffs Department to provide security in a potentially volatile situation. He had a deputy sheriff badge clipped on his belt, a sheriffs department radio, handcuffs, pepper spray, and a gun. And he testified that he told [one of the plaintiffs] “Sheriffs Department, you are under arrest,” handcuffed him, and enlisted another deputy to help him take [that plaintiff] out of the building and to the waiting police car.
Id. at 354-55. Priest’s actions were, as we observed, “the natural result of [his] official role within Bladen County, in which he was expected to perform law enforcement *688 functions at the ... plant on behalf of the Sheriffs Department.” Id. at 355. These circumstances compelled the conclusion “that Priest was acting under color of state law when making arrests at the [plant] on August 22.” Id. In so ruling, we observed that “[i]t is beyond dispute that the police function is ‘one of the basic functions of government,’ ” and that “an arrest is ‘the function most commonly associated with the police.’ ” Id. (quoting Foley v. Connelie, 435 U.S. 291, 297, 298, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978)). As such, we explained, “[i]t would be hard to imagine ... a more prototypically representative government function than Priest’s use of his official capacity to effectuate the arrest of [the plaintiffs].” Id.
In the Sixth Circuit’s Romanski decision, the plaintiff sought to hold a casino security officer liable under § 1983 for unlawful arrest. See 428 F.3d at 634. The court concluded that, “[w]here private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test.” Id. at 637. By contrast, the court explained, private security guards afforded “some police-like powers but not plenary police authority” do not qualify as state actors. Id. The court defined plenary police powers to include a private security guard’s state-conferred authority, “while on her employer’s property during her working hours,” to “make warrantless arrests to the same extent as a public police officer.” Id. at 638 n. 3. Thus, because the casino security officer had the same authority to make a warrantless arrest of the plaintiff as that conferred on public peace officers, the court concluded that she was a state actor. See id. at 638.
Unfortunately for Day, neither our Rodriguez decision nor the Sixth Circuit’s Romanski decision is helpful to him. First of all, the facts pertaining to the state actor issue are not nearly as compelling as in Rodriguez, where the private party was operating in his official role as an “auxiliary deputy sheriff,” served under the direction of and in concert with the Sheriffs Department, and was “invested with the full panoply of powers afforded to full-time deputies, including,” but not limited to, “the power to arrest.” See 338 F.3d at 354-55.[8] Moreover, even assuming we would agree with the Romanski court that plenary arrest authority alone could transform a private individual into a state actor, Officers Costa and Slader did not possess the same power to make warrantless arrests afforded to Virginia police officers. As discussed above, Virginia authorizes an armed security officer “to effect an arrest for an offense occurring ... in his presence.” Va.Code Ann. § 9.1-146 (emphasis added). The Commonwealth empowers police officers, by contrast, to “arrest, without a warrant, any person who commits any crime in the presence of the officer and any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence.” Id. § 19.2-81 (emphasis *689 added).[9] Indeed, not only is the arrest power of armed security officers more circumscribed than that of police officers, but it is also essentially the same as that of any private citizen. See Hudson v. Commonwealth, 266 Va. 371, 585 S.E.2d 583, 588 (2003) (recognizing that citizen may make arrest for misdemeanor breach of peace or felony committed in his presence). Accordingly, unlike in Romanski, Costa and Slader were not endowed with plenary arrest authority, but rather were “permitted to exercise only what were in effect citizens’ arrests.” See Romanski, 428 F.3d at 639 (distinguishing Wade v. Byles, 83 F.3d 902, 906 (7th Cir.1996) (concluding private security guard in public housing authority building was not state actor)). We are therefore constrained to reject the proposition that, under the public function test, Costa and Slader were acting as de facto police and, thus, were state actors.[10]
III.
Pursuant to the foregoing, we conclude that Day has not met his burden of proving the existence of an agency relationship between the Government and the private security guards, Officers Costa and Slader, whose conduct is under challenge. Accordingly, we reverse the district court’s suppression of the marijuana seized by Costa and Slader, as well as the firearm- and marijuana-related statements made to them by Day. We remand for such other and further proceedings as may be appropriate.

REVERSED AND REMANDED

. Citations herein to "J.A. -" refer to the contents of the Joint Appendix filed by the parties in this appeal.

. Notably, the district court ruled on the admissibility of Day's statements not only to the private security guards (Officers Costa and Slader), but also to the Chesterfield police officer called to the scene (Officer Neville). The Government "conceded that Officer Ne-ville engaged in custodial interrogation without advising Day of his Miranda rights,” and the court concluded that "any statements Day made to Neville about either the marijuana or the gun must be suppressed.” Day, 590 F.Supp.2d at 804. In this interlocutory appeal, the Government does not challenge the court's suppression of Day’s statements to Ne-ville. Thus, our review is limited to the status of Costa and Slader as Government agents and the suppression of the marijuana and the statements made to them.

. In these circumstances, we need not reach the Government’s alternative contention that the marijuana and marijuana-related statements should not have been suppressed because the marijuana-related statements were made during a Terry stop, and not during a custodial interrogation requiring Miranda warnings. Notably, this contention would not justify a complete reversal of the district court's suppression rulings, as the Government acknowledges that the firearm-related statements are inadmissible under Miranda if Costa and Slader were acting as Government agents.

. In Jarrett and Ellyson, we outlined the contours of the applicable test in the context of a Fourth Amendment, rather than a Fifth Amendment, claim. See Jarrett, 338 F.3d at 346-48 (assessing whether anonymous computer hacker was acting as Government agent when he procured child pornography files from defendant’s computer); Ellyson, 326 F.3d at 528-29 (deciding whether defendant’s roommate acted as Government agent when she located child pornography in shared residence and turned it over to police).

. As further support for the proposition that Officers Costa and Slader "were operating as de facto police on the night in question,” the district court observed that "[t]he officers were 'patrolling' the area in their unmarked sedan (a car of sufficient similarity to the stereotypical image of an unmarked police car that a Chesterfield officer 'assumed' it must be the security officers' vehicle),” and that "[b]oth officers were wearing black uniforms with gold emblems on the sleeves, displaying a gold badge virtually identical to a police shield, and bearing handguns,” rendering them "the quintessential image of law enforcement.” Day, 590 F.Supp.2d at 802.

. In certain circumstances, the conduct of a private party can be attributed to the Government as the result of a regulatory scheme. For example, in Skinner, the Supreme Court concluded that blood and urine tests required by private railroads — in voluntary compliance with federal regulations governing these tests — implicated the Fourth Amendment. See 489 U.S. at 614-15, 109 S.Ct. 1402. The Court explained that “specific features of the *686 regulations combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct.” Id. at 615, 109 S.Ct. 1402. Such features “removed all legal barriers to the testing authorized by” the regulations, “made plain [the Government’s] strong preference for testing,” and expressed the Government’s "desire to share the fruits of such intrusions.” l'd. This case, by contrast, presents “the more usual situation in which the government merely knows of or acquiesces in a private person's [conduct], whose fruits (e.g., drugs or a confession) are then appropriated by the government for its own purposes.” See Presley v. City of Charlottesville, 464 F.3d 480, 488 n. 7 (4th Cir.2006).

. The parties dispute whether, in the circumstances of Day's suppression motion, it is appropriate to apply a "free-standing” public function test or to utilize such a test as part of analyzing the first factor of the agency test. Because we conclude that Officers Costa and Slader were not state actors under the public function test, we need not resolve this issue.

. Notably, we also deemed it relevant in Rodriguez that, at the time of the challenged arrests, the private party was outfitted with an official deputy sheriff badge and verbally identified himself as being with the "Sheriff's Department.” See 338 F.3d at 355. Meanwhile, it was significant to the district court that, at the time of their encounter with Day, Officers Costa and Slader were driving a vehicle similar to an unmarked police car and wearing police-type uniforms and badges. See Day, 590 F.Supp.2d at 802. However, absent evidence indicating, for instance, that Costa and Slader’s car, uniform, and badges were official police items used at the Government's behest — similar to the evidence in Rodriguez — we are not persuaded that such items support the proposition that Costa and Slader were state actors.

. Section 19.2-81 of the Code of Virginia identifies nine categories of officers authorized to make warrantless arrests for suspected felonies committed outside their presence — a comprehensive list that noticeably excludes armed security officers. The nine categories of authorized officers include the following: "Members of the State Police force of the Commonwealth”; "Sheriffs of the various counties and cities, and their deputies”; "Members of any county police force or any duly constituted police force of any city or town of the Commonwealth”; "The Commissioner, members and employees of the Marine Resources Commission granted the power of arrest pursuant to § 28.2-900”; "Regular conservation police officers appointed pursuant to § 29.1-200”; "United States Coast Guard and United States Coast Guard Reserve commissioned, warrant, and petty officers authorized under § 29.1-205 to make arrests”; "The special policemen of the counties as provided by § 15.2-1737, provided such officers are in uniform, or displaying a badge of office”; "Conservation officers appointed pursuant to § 10.1-115”; and "Full-time sworn members of the enforcement division of the Department of Motor Vehicles appointed pursuant to § 46.2-217.” Va.Code Ann. § 19.2-81.

. Our conclusion that Officers Costa and Slader were not state actors is bolstered by an additional consideration: it does not appear that Virginia would consider armed security officers to be state actors on these facts. See Goldstein, 218 F.3d at 347 ("Another factor relevant to the state actor determination is how the state itself views the entity.”). The Court of Appeals of Virginia has concluded in similar circumstances, for example, that private department store security guards were not state actors required to give Miranda warnings. See Mier v. Commonwealth, 12 Va.App. 827, 407 S.E.2d 342, 345-46 (1991); see also Coston v. Commonwealth, 29 Va.App. 350, 512 S.E.2d 158, 160 (1999) (recognizing "[t]he general rule” that “a private security officer” is not "a public officer or public employee”).